# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C ~~2518~~ 2158 | DATE | 12/4/2002 |
| CASE TITLE | | Pearman vs. Christine Todd Whitman | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER. EPA's motion for summary judgment on Count I and Count II are granted. This case is hereby terminated. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | Document Number |
| | Notices mailed by judge's staff. | | DEC 05 2002 | | |
| | Notified counsel by telephone. | | date docketed | | 31 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| JD | courtroom deputy's initials | 02 DEC -4 PM 4:39 U.S. DISTRICT COURT | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
DEC 0 5 2002

RONALD PEARMAN           )
                         )
    Plaintiff,          )
                         )
v.                       )    No. 01 C 2158
                         )
CHRISTINE TODD WHITMAN   )    Honorable Judge Guzman
Administrator, United States )
Environmental Protection Agency, )
                         )
    Defendant.          )

## MEMORANDUM OPINION AND ORDER

Pending is Defendant Christine Todd Whitman's, Administrator Environmental Protection Agency, motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below this motion is granted.

## FACTUAL BACKGROUND

Ronald Pearman has worked for the Defendant Environmental Protection Agency ("EPA") in Chicago since 1979. Pearman is African-American. Pearman worked as an accountant for the EPA until 1989, when he was transferred to the Superfund Division. There, he worked as an Environmental Protection Specialist. (EPA LR 56.1¶1.) This position required Pearman to evaluate financial information as part of the EPA's effort to collect cleanup costs from polluters. (LR56.1¶2.)

1

### A. Pearman's Work History

Pearman has received "satisfactory" work evaluations throughout his time at the EPA. Only once did he get a different evaluation, receiving a "marginally satisfactory" evaluation. However, Pearman has been disciplined on a number of occasions while employed by the EPA. In 1983, he was suspended from work for taking unauthorized absences. (EPA LR 56.1¶.3.) In April of 1985, the EPA suspended Pearman for four days for being absent from work and for general misconduct. (EPA LR56.1¶ 4.) In 1986, the EPA brought disciplinary charges against Pearman; these charges were disposed of through a settlement between the EPA and Pearman that required Pearman to receive treatment for alcoholism at Michael Reese Medical Center. (EPA LR 56.1¶ 2.). Again, in 1989, Pearman was suspended from work for taking unauthorized absences, this time for three days. (EPA LR 56.1¶ 7.)

In 1991, Pearman received an official reprimand from the EPA for sexually harassing a female co-worker, specifically for touching her inappropriately. (EPA LR 56.1¶ 8.) In 1994, Pearman responded to a question about his request for leave by calling his supervisor a "stupid mother fucker." (EPA LR 56.1¶ 9.). After this incident the EPA suspended Pearman for seven days for insubordination and using abusive language to his supervisor.

In November of 1997, Pearman received a five-day suspension for sleeping while on duty and disrupting a staff meeting. (EPA LR56.1¶ 10.) In 1998, Pearman entered into a settlement with the EPA over another disciplinary incident. (EPA LR56.1 ¶ 6.) In

November of 1998, Pearman's supervisors noticed that he was unsteady on his feet, he smelled of alcohol, and was slurring his words. (EPA LR56.1¶ 11.) They concluded that he was drunk, and directed him to go to the EPA's health unit. Pearman refused to go, at least without a union representative present. (EPA LR56.1¶ 12.) Pearman claims he was adjusting to new dentures that caused his speech to slur. (EPA LR56.1¶ 11.) The EPA later concluded that his refusal to go to the health unit demonstrated that he had been intoxicated, that Mr. Pearman had a chronic problem with alcohol, and that it was unsure what sanctions could help Mr. Pearman with his problem. (EPA LR56.1¶ 13.)

**B. Pearman Version of the Events of February 24, 2000**

On or about February 24, 2000, at about 11:30 a.m. Pearman and Thomas Marks, Pearman's supervisor, had a discussion regarding a detailed breakdown of Pearman's sites. (Plaintiff's LR 56.1 ¶ 13.) Marks accused Pearman of being intoxicated and "slurring his words" but did not refer or order Pearman to go to the health service unit in compliance with Order No. 3120.3A (Plaintiff's Exhibit 1, ¶14, Ex. 8. .88)(Plaintiff's LR 56.1 ¶ 14.) The EPA's Order on Employee Alcoholism and Drug Abuse Program, No. 3120.3A, requires all EPA supervisory personnel, to immediately refer any EPA employee to available medical service for the sole purpose of diagnosis and emergency treatment if an EPA employee does not appear to be in full control of his or her faculties. (Plaintiff's LR 56.1 ¶ 12.)

At approximately 1:00 p.m. on February 24, 2000, Pearman stopped by Sabrina Argentieri's office to discuss a superfund case with her (Plaintiff's L.R. 56.1¶15). Sabrina

Argentieri is the Assistant Regional Counsel in the Office of Regional Counsel. She is an attorney. (*Id.*). Pearman and Argentieri were working on a superfund case called Springfield Mercury, wherein the clean up had been completed and Pearman came on the case to recover costs that had been expended during the clean up. (Plaintiff's L.R. 56.1¶18)

Tom Marks encouraged Plaintiff to communicate more with the Assisant Regional Counsel who was handling the sites. (Plaintiff's L.R. 56.1 ¶ 19) Plaintiff leaned against Argentieri's door and called out her name because she was busy working. (Plaintiff's L.R. 56.1 ¶ 20) When Argentieri looked at Plaintiff inquisitively, Plaintiff stated, "Well, you know who am I". (*Id.*) Plaintiff then proceeded into the office and sat down. (Plaintiff's L.R. 56.1 ¶ 21) Plaintiff told Argentieri that the case should be closed out because there was no further work that could be done. (*Id.*) Plaintiff and Argentieri had a disagreement as to whether to close out the case. (*Id.*)

Another individual, Eva Hahn who was also an Assistant Regional Counsel, was present at another desk in the office. (Plaintiff's LR. 56.1 ¶ 22) Eva Hahn shares the office with Argentieri. (*Id.*) During the conversation with Argentieri, Argentieri continued to look past Plaintiff and make eye contact with Hahn. (Plaintiff's L.R. 56.1 ¶ 23) Feeling that Hahn was trying to listen in, Plaintiff said in a somewhat sarcastic manner to her, "Are you deaf?" (*Id.*) Since the conversation with Argentieri was not going to be resolved between them, Argentieri suggested that their supervisors decide whether to close out the case, and Plaintiff agreed. (Plaintiff's L.R. 56.1 ¶ 24)

4

Immediately after Plaintiff and Argentieri decided to leave the decision to the supervisors, Plaintiff left Argentieri's office. (Plaintiff's L.R. 56.1 ¶ 25) The conversation with Argentieri lasted approximately ten minutes. (*Id.*) During the conversion with Argentieri, Plaintiff only talked about the case they had together. (Plaintiff's L.R. 56.1 ¶ 26) Plaintiff did not talk about anything else. (*Id.*) Plaintiff never used any profanity at Argentieri or anyone else in the room. (Plaintiff's L.R. 56.1 ¶ 27) Plaintiff never raised his voice. (*Id.*) Argentieri stated that she smelled a "sweet perfume-like order" emanating from Plaintiff. Argentieri then left the office to find another colleague, Mr. Katzback, and asked him what he smelled. Mr. Katzback stated that he smelled some kind of perfume. (Plaintiff's L.R. 56.1 ¶ 28) The perfume-like odor lingered in Argentieri's office for several minuets. (Plaintiff's L.R. 56.1 ¶ 29.) Mr. Katzback never stated that he smelled alcohol in Argenticris office. (Plaintiff's L.R. 56.1 ¶ 30) After Plaintiff left Argentieris office, Argentieri wrote a memo and reported to her Section Chief that Plaintiff was allegedly intoxicated. (Plaintiff's L.R. 56.1 ¶ 30.) Plaintiff does wear strong cologne every day. (Plailntiff's L.R. 56 ¶ 30) After leaving Argentieri's office, Plaintiff returned to his desk. (Plaintiff's L.R. 56.1 ¶ 33.) Plaintiff was to train Rose Lodge on cost recovery; however, since Rose Lodge was not back from lunch, Plaintiff had some time to relax. (*Id.*) Plaintiff put in ear plugs which sit in his ears, unlike headphones. (Plaintiff's L.R. 56 ¶ 34.) While waiting for Rose Lodge to return, Plaintiff sat at his desk with the ear plugs in his ears and listened to jazz music. (*Id.*) While listening to jazz music, Plaintiff was startled by a tapping on his chair, wherein Plaintiff turned around in his chair

and was confronted by Tom Mark. Marks alleges that Plaintiff was sleeping at his chair. (Plaintiff's L.R. 56 ¶ 35)

Wendy Carney alleges that she observed Plaintiff for about five minutes. (Plaintiff's L.R. 56 ¶ 38) Marks informed Plaintiff that he heard about an incident in Regional Counsel with Argentieri. (*Id.*) Plaintiff followed Marks into a conference room, wherein Marks proceed to discuss the incident with Argentieri. (Plaintiff's L.R. 56 ¶ 39) Plaintiff inquired as to why his discussion with Argentieri was such a major issue. (Plaintiff's L.R. 56 ¶ 40.) Marks replied that it was purported that Plaintiff had an argument with Argentieri. (*Id.*) Plaintiff then requested that he be allowed to seek union representation. (Plailntiff's L.R. 56.1 ¶ 40.) At this point, Allen Nickel, a human resources employee, knocked on the door and Marks spoke with Nickels outside the office. (Plaintiff's L.R. 56.1 ¶ 41.) When Marks returned, he stated to Plaintiff that Plaintiff needed to go to the health service office. (*Id.*) Plaintiff was never told that he was ordered to go to the health services office because he was intoxicated. (Plaintiff's L.R. 56 ¶ 42.) Plaintiff was never told that Marks believed Plaintiff was sleeping at his desk. (*Id.*) Plaintiff did not understand why he had to go to the health service office because of an argument with Sabrina Argentieri. (Plaintiff's L.R. 56 ¶ 43.) Plaintiff informed Marks that he had to go to the health service office, then Plaintiff wanted his union representative with him. (*Id.*) Marks stated that Plaintiff did not need one. (*Id.*) Plaintiff left the office, and Marks followed him out to the washroom. (Plaintiff's L.R. 56 ¶ 44.) Plaintiff then went to the fourth floor to locate his union representative, and Marks

followed him to the fourth-floor. (Plaintiff's L.R. 56.1 ¶ 44.) When Plaintiff was unable to locate a union representative, (*Id.*) Plaintiff then proceeded down to the lobby in order to get on another set of elevators to the 18th floor to locate an individual who Plaintiff had been using as a representative. (*Id.*) Marks followed Plaintiff down to the lobby. (*Id.*)

Marks alleges that while he followed Plaintiff to the bathroom, to the fourth floor and down to the lobby that Plaintiff was staggering a great deal and was unstable. (Plaintiff's L.R. 56.1 ¶ 45.) Marks then states that as soon as Plaintiff reached the lobby that Plaintiff was more stable and was in control to walk a straight line because Plaintiff knew that Marks was watching him. (*Id.*) The lobby is a public area where there are a lot of people. (*Id.*) When Plaintiff was unable to find any union representative, Plaintiff then went to the health service office. (Plaintiff's L.R. 56.1 ¶ 47.) Plaintiff informed the nurse that his supervisor recommended that he come to the health service office, but Plaintiff was not aware as to the reason why he was sent there. (*Id.*) Plaintiff stated that the only things he noticed was that he has a sinus or congestion which was going to make him drowsy. (Plaintiff's L.R. 56.1 ¶ 48.) Plaintiff informed the nurse that he only had about an hour left, so he would put in a leave slip and go home. (*Id.*) Marks never called the health service office to inform them that Plaintiff may be coming in to be treated for intoxication. Prior to February 24, 2000, Marks never referred Plaintiff to the health service unit for any treatment related to alcohol or drugs or for any other type of symptoms. (Plaintiff's L.R. 56.1 ¶ 50.) Tom marks knew that it was the EPA policy to call and talk to the medical personnel and tell them why an employee is being sent to the

7

health services office. (Plaintiff's L.R. 56.1 ¶ 51.)

Plaintiff did not consume any alcohol on February 24, 2000. (Plaintiff's L.R. 56.1 ¶ 52.) David Ullrich received William Muno's proposed removal of Plaintiff dated March 20, 2000. (Plaintiff's L.R. 56.1 ¶ 53.) Mr. Muno's proposed removal did not state that Argentieri and Katzback both stated that they smelled some kind of perfume odor. (*Id.*) Nor does the proposal state that Argentieri got a third person to come in and smell the room after Plaintiff left. (*Id.*)

### C. The EPA's Version of the Events of February 24, 2000

On February 24, 2000, at approximately 11:35 a.m., Pearman called his supervisor, Thomas Marks, to his desk to discuss a work related matter. Marks noticed that Pearman's breath smelled of alcohol and Pearman slurred his words when he spoke. (EPA LR 56.1¶ 33.) Due to his belief that Pearman had been drinking, Marks told Pearman that he should eat a good, solid meal at lunch before returning to work. (EPA LR 56.1 ¶ 34.) Marks breached EPA protocol by not reporting Pearman's condition to the Health Unit and not telling Pearman to go there immediately. (EPA L.R. 56.1 ¶ 34.) EPA rules and policicies mandate that a supervisor who suspects that an employee is intoxicated should report the employee's condition and send the employee to the Health Unit for treatment. (EPA LR 56.1 ¶34.)

At approximately 1 p.m. that day, Pearman walked into the office of Sabrina Argentieri, a lawyer for the EPA. (EPA LR56.1¶ 13.) Argentieri shared her office with another lawyer, Eva Hahn. (EPA LR 56.1¶24.) Pearman did not have an appointment to

8

see Argentieri. (EPA LR 56.1 ¶ 16.) Pearman and Argentieri were both working on the same case. (EPA LR 56.1 ¶ 20.) Argentieri had interacted with Pearman before but did not initially recognize him. Argentieri noticed that Pearman leaned heavily against the door jam when first talking with her, and then staggered to a chair in her office. She also noticed a very strong, perfume like odor, which she identified as alcohol, emanating from Pearman. (EPA LR56.1 ¶ 18.) Argentieri claims that Pearman was unable to focus his eyes on her during their conversation. (EPA LR56.1 ¶ 19.)

Hahn was also in the office with Argentieri and Pearman, and noticed his physical behavior and the strong smell coming from him. (EPA LR56.1 ¶¶ 25, 26 & 29.) She also identified the smell as alcohol. (EPA LR 56.1 ¶26.) Pearman began to discuss the case on which he was working with Argentieri. He told her that she was standing in the way of closing the case. (EPA LR56.1 ¶ 20.) Argentieri disagreed, and explained why she thought differently. Pearman insisted that Argentieri close the case and appeared to become angry. (EPA LR56.1 ¶ 27.) Eventually, Argentieri ended the conversation by telling Pearman that their supervisors should decide the matter. Argentieri told Pearman the name of her supervisor three times, and eventually had to write his name down on a piece of paper. He then staggered out of the office. (EPA LR56.1 ¶ 29.) The encounter lasted about ten minutes. (EPA LR56.1 ¶ 15.) Both Argentieri and Hahn reported feeling frightened and physically intimidated by Pearman. (EPA LR56.1 ¶ 21 & 28.) They also both strongly believed that he was drunk. (EPA LR56.1 ¶ 18 & 28) They asked another employee into their office, and he also noticed a "perfume-like" smell that Pearman had apparently left in

his wake. (*Id.*)

The two women reported Pearman's behavior and their suspicions to their supervisors. (EPA LR56.1¶ 23 & 30) At 1:30 p.m. that day Marks went to see Pearman at his desk and found him apparently sleeping. His head was down, resting on his hand and his eyes were closed. Marks said "hello" to Pearman, but got no response. (EPA L.R. 56.1 ¶ 34.) Marks left the area and heard word of the incident with Argentieri. He consulted with an EPA attorney about what course to follow, and returned to Pearman's desk. Pearman did not appear to have moved. (EPA LR56.1¶ 35.)

Marks then retrieved Pearman's second level supervisor Wendy Carney, and they returned to Pearman's desk, now around 1:50 p.m. (EPA LR56.1¶¶ 36 & 37.) Pearman was in the same position as before, and Marks claims that he heard Pearman snoring. Pearman denies that he was snoring or asleep. (EPA LR56.1¶ 37.) Marks shook Pearman's chair until Pearman lifted his head and looked at him. (EPA LR56.1¶ 38.) Marks asked him if he was all right, and asked him to talk in private about what had happened with Argentieri. Pearman said he was fine, and the two men discussed what had happened. Pearman was incoherent throughout this exchange. Marks smelled alcohol on Pearman. (EPA LR56.1¶ 39.) Pearman admits that he had his eyes closed and his head on his arm, but claims that he was not asleep, just listening to music via a small set of earplug headphones. (EPA LR56.1 ¶¶37, 38 & 39.)

Since Marks believed Pearman to be drunk, he asked him to go to the EPA's health unit. Pearman refused to go without a union representative. (EPA LR56.1¶ 40.) Pearman

10

went to the bathroom, and then went with Marks to the union office. No one was present, so Pearman and Marks went to the lobby of the building to look for a representative. Marks then left Pearman. Marks never called the Health Unit to tell them that Pearman would be coming, or that he believed Pearman to be intoxicated. (Pl. 56.1 ¶ 4.) Later that day, Pearman went to the health unit, told the nurse there he had a sinus problem, received some medicine, and went home. (EPA's LR56.1 ¶ 42.)

### D. Pearman's Removal from the EPA

On March 1, 2000 the EPA put Pearman on administrative leave due to his behavior on February 24th. (EPA LR56.1 ¶ 48.) On March 20, 2000 the EPA sent Pearman a notice of proposed termination. In this notice the EPA cited the events of February 24 (which it believed consisted of being drunk on the job, sleeping on the job, and being abusive toward a co-worker), Pearman's history of disciplinary problems, his inability to satisfactorily perform his job, and his lack of potential for rehabilitation. (EPA LR56.1 ¶ 51.)

The Deputy Regional Director of the EPA, David Ullrich, was responsible for deciding this matter. (EPA LR56.1 ¶ 54.) On April 19, 2000, Ullrich met with Pearman, Pearman's counsel, and Pearman's union representative to discuss the proposed termination. The parties discussed Pearman's conduct on February 24, 2000, the observations of the EPA employees, and the severity of the proposed disciplinary action. (EPA LR 56.1 ¶58.) On or about April 27, 2000, Ullrich issued his decision: to remove Pearman as of May 5, 2000. (EPA LR56.1 ¶ 59.) In making this decision, Ullrich

11

evaluated Pearman's conduct based on five categories: the seriousness of Pearman's offenses, the influence of his conduct on employee morale, his potential for rehabilitation, his prior disciplinary problems, and his job performance over the course of his employment at the EPA. (EPA LR 56.1 ¶ 61.)

Ulrich decided that Pearman should be fired due to his behavior on February 24, 2000, which included drunkenness on duty, abusive behavior with co-workers, and sleeping on duty. He also cited Pearman's earlier disciplinary actions, at least one of which was alcohol related, and the lack of improvement in his conduct. He also considered Pearman's satisfactory job performance. (EPA LR 56.1 ¶ 62.) Pearman had worked under Ullrich previously. When Pearman filed a complaint and had requested to be reassigned out of the finance unit in 1992, he was placed in a division where Ullrich was the director.

Ullrich assigned Pearman tasks that were below his job status. (EPA LR56.1 ¶ 66.) Ullrich claims that his decision to fire Pearman was not influenced by Pearman's filing of Union grievances. (EPA LR 56.1 ¶ 66.) The EPA fired Pearman on May 5, 2000.
On June 5, 2000, Pearman filed a notice of appeal of his termination with the Merit Systems Protection Board. (EPA LR 56.1 ¶ 68.) Pearman's hearing was on September 14, 2000 and lasted one full day; an administrative law judge conducted the hearing, and Pearman had an attorney present. (EPA LR 56.1 ¶ 69) At the hearing the EPA brought five witnesses, Sabrina Argentieri, Eva Hahn, Tom Marks, Wendy Carney, and David Ullrich. (EPA LR56 ¶ 70.) Pearman was the only witness for his side. (EPA LR56.1 ¶ 71.) On

January 30, 2001, the Merit System Protection Board affirmed the EPA's decision to terminate Pearman. (EPA LR56.1¶ 72.) The Administrative Law Judge found that a preponderance of the evidence showed that Pearman was under the influence of alcohol, was sleeping, and had engaged in abusive conduct on February 24, 2000. (EPA LR 56.1¶¶ 73, 74 & 75.)

**E. Other Facts**

Approximately half of the people in Pearman's former workgroup are African American, two thirds were women, and most of his workgroup was at his same classification level. (EPA LR 56.1¶80 & 89.) Other workers have come to work smelling of alcohol and, when discovered by supervisors, have also received disciplinary action; the two men on the record were white males and were both fired (EPA LR56.1¶ 64 & 84.) Pearman has shown no evidence that any other EPA employee was found to be intoxicated on the job by a supervisor and not fired. (EPA LR 56.1¶¶ 84 & 85.) No evidence shows that other workers have fallen asleep or used abusive language with a co-worker and been caught by a supervisor. (EPA LR56.1¶ 85 & 86.) Another employee filed a complaint against the EPA and was reinstated to his same position. (P1. LR56.1¶ 87.)

After the ruling by the Merit Systems Protection Board, Pearman brought this action alleging that he was fired due to his race and as an act of retaliation for filing past complaints and appealing his disciplinary action.

## DISCUSSION

### A. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to the interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Cox v. Acme Health Services, Inc.*, 55 F. 3d 1304, 1308 (7th Cir. 1995). A genuine issue of material fact exists for trial only, if after viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonably jury could not return a verdict for the non-movant. *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *Hedberg*, 47 F.3d at 931. If the movant meets this burden, the non-movant must then set forth specific facts to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party "who makes a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *See Sarsha v. Sears, Roebuck & Co.*, 3 F. 3d 1035, 1038 (7th Cir. 1993). "[S]ummary judgmet is improper in a discrimination

14

case where a material issue involves any weighing of conflicting indications of motive and intent." *Kephart v. Inst. of Gas Tech.*, 630 F. 2d 1217, 1218 (7th Cir. 1980).

## B. Retaliation And Discrimination

Pearman has claimed race discrimination under Title VII of the Civil Rights Act of 1964, as amended 42 § U.S.C. 2000e *et seq.* in Count I of his complaint and retaliation in Count II. Title VII makes it illegal for an employer to discriminate against an employee because of the employee's race. 42 § U.S.C. at 2000e-2(a)(1). A plaintiff suing under Title VII must prove that he was a victim of intentional discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).

In setting forth a racial discrimination claim, a plaintiff may pursue two "distinct evidentiary paths." *Kormoczy v. Secretary, US. Dept. of HUD*, 53 F.3d 821, 824 (7th Cir. 1995). On the one hand, he may choose to present direct evidence of discriminatory intent. *Essex v. United Parcel Service*, 111 F.3d 1304, 1308 (7th Cir. 1997). Alternatively, he may utilize an indirect method to raise an inference of an illegal motive, which involves a burden-shifting method established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973) and *Stone v. City Indianapolis Public utilities Division* 281 F.3d 640, 644 (7th Cir. ) (retaliation). The first step for the plaintiff under the *McDonnell Douglas* method is to establish a prima facie case of race discrimination. *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998); *Pasqua v. Metropolitan Lfe Ins. Co.*, 101 F.3d 514 at 516. To establish a prima facie case of race discrimination, the plaintiff must show that he is (1) in a protected class;

or engaged in statutorily protected activity (2) was fulfilling his employers legitimate expectations; (3) was the subject of a materially adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *Wells v. Unisource Worldwide Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002) (discrimination), *Hilt-Dyson v. City of Chicago* 282 F.3d 456, 465 (7th Cir. 2002) (retaliation). *Oates v. Discovery Zone*, 116 F.3d 1161, 1171 (7th Cir. 1997); *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir. 1994).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate legitimate nondiscriminatory reason for its action. *Cowan v. Glen brook Securities Services, Inc.*, 123 F.3d 438, 445 (7th Cir. 1997). The burden then shifts back to the plaintiff to show that the defendant's reason is in fact pretext for discrimination. *Wells* 289 F.3d at 1006; *Hilt-Dyson* 282 F.3d at 465, *Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1290 (7th Cir. 1997). In order to meet this burden, the plaintiff cannot just show that the employer's reasons were doubtful or mistaken, but must show that its reasons were a lie and had no basis in fact. *Wells* 289 F.3d at 1006; *Hilt-Dyson* 282 F.3d at 465, *Crim v. Board of Education of Cairo School District No. 1*, 147 F.2d 535, 541 (7th Cir. 1998); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996); *Russell v. Acme Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995) The ultimate burden of proof remains with the plaintiff at all times. *See Kirk v. Federal Property Management Corp.*, 22 F.3d 135, 138 (7th Cir. 1994).

Pearman contends that the EPA terminated him because of his race, African-

16

American. Pearman offers no statements or admissions from anyone at the EPA or anywhere else that suggest that his termination was the result of being African-American. Therefore, because Pearman has no direct evidence of race discrimination and/or retaliation, he must proceed under the indirect method of proof.

It is undisputed that Pearman satisfies elements one and three of his prima facie case for discrimination and retaliation  Pearman is African-American and has in the past engaged in statutory protected expression, satisfying element one of both prima facie cases. Also, Pearman, it is undisputed, suffered a materially adverse employment action when the EPA terminated his employment, satisfying element three.

However, the second element of Pearman's prima facie case, whether an employee was meeting his employer's legitimate expectations, has not been satisfied by Pearman. It is undisputed that Pearman throughout his employment at the EPA received satisfactory job reviews. However, it is also undisputed, that Pearman was disciplined on a number of occasions while employed by the EPA. Pearman's disciplinary problems have ranged from sleeping on the job and taking excessive leave to cursing his supervisor and sexually harassing a co-worker. Thus, even though Pearman was receiving satisfactory job performance reviews, it cannot be concluded that he was performing to his employer's expectations.

Apart from being unable to show that he was meeting the EPA's legitimate expectations, Pearman also has not shown that similarly situated employees, who are not part of the protected class, were treated more favorably. In the final incident prior to his

termination, Pearman's supervisors claim that Pearman was abusive toward his co-workers, was intoxicated on the job, and fell asleep at his desk. Pearman has presented no evidence of any other employee has been charged with similar conduct. Although Pearman makes general allegations that he was treated differently from other employees in these situations, the failure to name specific employees means that Pearman cannot establish the fourth element of his prima facie case with respect to these claims. See *Hoffman-Dombrowski v. Arlington Int'l Tacecourse, Inc.*, 254 F.3d 644, 651 (7th Cir 2001). Even taking Pearman's assertions as true that other employees at theEPA come to work intoxicated, Pearman has failed to raise issues of fact that these individuals were not, in fact, disciplined, had the history of disciplinary incidences against them, were abusive to co-workers and/or were asleep on the job. In fact, the EPA itself has provided the only evidence of other employees who have been caught drinking on the job and it is undisputed that both of these employees lost their jobs Moreover, even if these facts were found to be true, the quantity and quality of these alleged compartor's conduct cannot be concluded to be similar in light of the conduct Pearman engaged in later that day.. Pearman has not produced evidence that any other employee with a similar disciplinary record has kept his job.*See Peele v. Country Mutual Insurance Co.*, 288 F. 3d 319, 329 (7th Cir. 2002); *Miller v. Citizen Security Group, Inc.* 116 F. 3d 343, 347 (7th Cir. 1997).

Thus, the record demonstrates that Pearman cannot establish a *prima facie* case of race discrimination or retaliation. However, even if Pearman could satisfy his *prima facie* case Pearman has not raised an issue of material fact that the EPA's legitimate

nondiscriminatory reasons for terminating him, were pretextual. Pearman has not offered any evidence from which a rational jury could concluded that Defendant did not honestly believe its proffered reason for discharging him. *See Debs v. Northeastern Illinois Univ.*, 153 F. 3d 390, 396 (7th Cir. 1998)(holding an honest belief in the nondiscriminatory reason offered by the decision maker will be sufficient even if the reasons are foolish, trivial or baseless). To be sure, the EPA should have sent Pearman down to the health clinic before lunch in accord with their policies but that fact that his supervisor later followed this policy indicates that Pearman's supervisor was concerned that Pearman was under the influence of alcohol and needed medical treatment. Therefore, the Court find that Pearman has not offered any evidence from which a trier of fact could concluded that the EPA's proffered reason for terminating Pearman was a pretext for discrimination.

## CONCLUSION

For the reasons set forth aove the EPA's motions for summary judgment on Count I and Count II are granted. This case is hereby terminated. This is a final and appealable order.

SO ORDERED

ENTERED:

HON. RONALD A. GUZMAN
United States Judge